UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| ALYSSON MILLS, IN HER CAPACITY AS RECEIVER FOR ARTHUR LAMAR ADAMS AND MADISON TIMBER PROPERTIES, LLC, | Case No. 3:19-cv-_941CWR-FKB |
| | Arising out of Case No. 3:18-cv-252, *Securities and Exchange Commission v. Arthur Lamar Adams and Madison Timber Properties, LLC* |
| Plaintiff, | |
| v. | Hon. Carlton W. Reeves, District Judge |
| TRUSTMARK NATIONAL BANK; BENNIE BUTTS; JUD WATKINS; SOUTHERN BANCORP BANK; and RIVERHILLS BANK, | |
| Defendants. | |

## COMPLAINT

### * * * TRIAL BY JURY DEMANDED * * *

Alysson Mills, in her capacity as the court-appointed receiver for Arthur Lamar Adams and Madison Timber Properties, LLC (the "Receiver"), through undersigned counsel, files this Complaint against Trustmark National Bank, Bennie Butts, Jud Watkins, Southern Bancorp Bank, and RiverHills Bank (collectively "Defendants"), stating as follows:

## INTRODUCTION

For more than ten years, Arthur Lamar Adams ("Adams"), through his companies Madison Timber Company, Inc. and Madison Timber Properties, LLC ("Madison Timber"), operated a Ponzi scheme that defrauded hundreds of investors. Investors believed that Madison Timber used investors' money to purchase timber from Mississippi landowners; that Madison Timber sold the timber to Mississippi lumber mills at a higher price; and that Madison Timber repaid investors their principal plus interest with the proceeds of those sales. Investors received timber deeds that purported to secure their investments—but the deeds were fake. There was no timber and no proceeds from sales of timber.  The money used to repay existing investors came solely from new investors.

Madison Timber had to continuously grow to repay existing and new investors, and continuously grow it did.  In 2011, Madison Timber took in approximately $10 million from investors.  By 2018 that number had grown by a factor of 16.  In the one-year period prior to April 19, 2018, the date Adams surrendered to federal authorities and confessed to the Ponzi scheme, Madison Timber took in approximately $164.5 million.  As of April 19, 2018, Madison Timber had 501 outstanding promissory notes, reflecting debts to investors of more than $85 million.[1]

Defendants are financial institutions that provided banking services that enabled and sustained the Madison Timber Ponzi scheme. Defendants could see Adams's fraud long before his surrender and confession on April 19, 2018, but they looked away while they collected fees. Without Defendants' banking services, the Madison Timber Ponzi scheme could not have succeeded. Because Defendants contributed to the success of the Madison Timber Ponzi scheme, they are liable for the debts of the Receivership Estate to investors.

---

[1] The evidence at Adams's sentencing established that of the $164.5 million that Madison Timber received in its last year of operation, it paid back approximately $79.5 million, leaving an $85 million difference.  The outstanding principal and interest owed to investors is necessarily higher.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action and its parties, and venue is proper in this Court, pursuant to the Securities Act of 1933, 15 U.S.C. § 77v(a); the Securities & Exchange Act of 1934, 15 U.S.C. § 78aa; 28 U.S.C. § 1692; and 28 U.S.C. § 754.

2.      This action arises in connection with and is ancillary to the civil action already pending in this Court styled *Securities & Exchange Commission v. Arthur Lamar Adams and Madison Timber Properties, LLC*, No. 3:18-cv-252-CWR-FKB.  In that civil action, the Securities & Exchange Commission ("S.E.C.") alleges that "[b]eginning in approximately 2004," Adams, through Madison Timber, "committed securities fraud by operating a Ponzi scheme" in violation of the Securities Act of 1933 and the Securities & Exchange Act of 1934.[2]

3.      The S.E.C. requested that the Court appoint a receiver for the estates of Adams and Madison Timber.[3]  As the Court that appointed the Receiver, this Court has jurisdiction over any claim brought by the Receiver in the execution of her duties. "[I]t is well-settled that when an initial suit results in the appointment of the receiver, any suit that the receiver thereafter brings in the appointment court in order to execute h[er] duties is ancillary to the main suit." *U.S. Small Bus. Admin. v. Integrated Envtl. Sols., Inc.*, No. 05-cv-3041, 2006 WL 2336446, at *2 (S.D. Tex. Aug. 10, 2006) (citing *Haile v. Henderson Nat'l Bank*, 657 F.2d 816, 822 (6th Cir. 1981)).  *See also* 28 U.S.C. § 1692 ("In proceedings in a district court where a receiver is appointed for property, real, personal, or mixed, situated in different districts, process may issue and be executed in any such district as if the property lay wholly within one district . . . ").

4.      Consistent with that precedent, Chief U.S. District Judge Daniel P. Jordan III has ordered that all "cases filed by the duly appointed Receiver . . . which . . . arise out of or relate to

---

[2] Doc. 3, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss.).
[3] Docs. 11, 21, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss.).

[*Securities & Exchange Commission v. Arthur Lamar Adams and Madison Timber Properties, LLC*, No. 3:18-cv-252-CWR-FKB] shall be directly assigned by the Clerk of Court to U.S. District Judge Carlton W. Reeves and U.S. Magistrate Judge F. Keith Ball."[4]  In compliance with Chief Judge Jordan's order, the Receiver shall separately file, contemporaneously with this complaint, a notice of relatedness.

## PARTIES

**The Receiver**

5.      Plaintiff Alysson Mills is the Court-appointed Receiver for the estates of Adams and Madison Timber. She stands in Madison Timber's shoes for the express purpose of maximizing assets available to Adams's victims. "As directed by the court, a receiver may systematically use ancillary litigation against third-party defendants to gather the entity's assets. Once gathered, these assets are distributed through a court-supervised administrative process."[5]

6.      The Court's order of appointment vests in the Receiver the power to, among other things:

> investigate and . . . bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging her duties as Receiver.[6]

The Receiver brings this civil action in her capacity as Receiver and pursuant to the powers vested in her by the Court's orders and applicable law.  Madison Timber's debts are now the Receivership Estate's. The Receiver has standing to pursue, *inter alia*, claims against third parties whose actions

[4] Doc. 45, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss).
[5] *Zacarias v. Stanford Int'l Bank, Ltd.*, No. 17-11073, 2019 WL 6907376, at *7 (5th Cir. Dec. 19, 2019).
[6] Doc. 33, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss). By order dated August 22, 2018, the Court eliminated the requirement that the Receiver obtain "prior approval of this Court upon ex parte request" before bringing any legal action.  Doc. 38, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss).

contributed to the success of the Madison Timber Ponzi scheme, and therefore to the debts of the Receivership Estate.

7.    Adams misused Madison Timber to sustain a singular fraud over many years, and Defendants assisted him.  In a Ponzi scheme, "the harms arise from a singular scheme, not isolated acts—that is, from a composite of conduct by numerous conspirators taken over many years, collectively establishing and perpetrating the fraud."[7]  Defendants are part of that composite here. The Receiver has standing to pursue claims against Defendants as the Court-appointed Receiver for Madison Timber.

8.    To remove any doubt, in aid of the Receivership Estate's recovery, investors have assigned their claims against Defendants to the Receiver, whose purpose is to maximize assets for investors' benefit. The Receiver therefore also has standing to pursue claims against Defendants as the holder of assignments executed by investors.

**Defendants**

9.    Defendant Trustmark Corporation d/b/a Trustmark National Bank ("Trustmark") is a Mississippi corporation doing business in Mississippi.

10.    Defendant Bennie Butts is a Mississippi resident who at all relevant times was employed by Trustmark.

11.    Defendant Jud Watkins is a Mississippi resident who at all relevant times was employed by Trustmark or RiverHills.

12.    Defendant Southern Bancorp Bank ("Southern Bancorp") is a Mississippi corporation doing business in Mississippi.

---

[7] *Zacarias v. Stanford Int'l Bank, Ltd.*, 931 F.3d 382, 397 (5th Cir. 2019), *opinion withdrawn and superseded on reh'g*, No. 17-11073, 2019 WL 6907376 (5th Cir. Dec. 19, 2019).

13.     Defendant RiverHills Bank ("RiverHills") is a Mississippi corporation doing business in Mississippi.

## MADISON TIMBER

14.     For more than ten years, Lamar Adams, through Madison Timber, operated a Ponzi scheme that purported to purchase timber from Mississippi landowners and resell it to Mississippi lumber mills at higher prices.

15.     Investors in Madison Timber delivered to Madison Timber large sums of money, typically in excess of $100,000 dollars, in reliance on the promise that Madison Timber would repay them their principal plus interest, typically 13% per annum.  The promised interest invariably far exceeded the interest any investor might receive on any other asset-backed investment.

16.     Investors believed that Madison Timber would use their money to acquire timber deeds and cutting agreements from Mississippi landowners; that Madison Timber would then sell the timber to Mississippi lumber mills at a higher price; and that with the proceeds of those sales Madison Timber would repay investors their principal and promised interest.

17.     In exchange for their investments, investors in the Madison Timber Ponzi scheme received a promissory note in the amount of their investment, payable in twelve monthly installments together with the promised interest; twelve pre-dated checks, each in the amount of the installment due under the promissory note; a timber deed and cutting agreement by which a named landowner purported to grant to Madison Timber the rights to harvest timber on the land described in the deed; and a timber deed and cutting agreement by which Madison Timber purported to grant its own rights to the investor.

18.     In fact, the timber deeds and cutting agreements were fake.  Madison Timber had no rights to harvest timber and no timber to cut and sell.  Because Madison Timber had no revenues whatsoever, investors were being repaid with new investors' money.

19.     Each month, Madison Timber required more and more new investors to repay existing investors.  Like any Ponzi scheme, Madison Timber had to continuously grow.

20.     In 2011, Madison Timber took in approximately $10 million from investors.  By 2018 that number had grown by a factor of 16.

21.     In April 19, 2018, on the heels of investigations of him by the F.B.I. and the U.S. Attorney's Office for the Southern District of Mississippi, Adams turned himself in. In the one-year period prior to April 19, 2018, Madison Timber took in approximately $164.5 million. As of April 19, 2018, Madison Timber had 501 outstanding promissory notes, reflecting debts to investors of more than $85 million.[8]

22.     Adams pleaded guilty to the federal crime of wire fraud and "admit[ted] to all of the conduct of the entire scheme and artifice to defraud."[9]  On October 30, 2018, he was sentenced to a term of imprisonment of 235 months.[10]

23.     The S.E.C. separately charged Adams with violations of the Securities Act of 1933 and Securities & Exchange Act of 1934, alleging in its complaint that "[b]eginning in approximately 2004," Adams, through Madison Timber, "committed securities fraud by operating a Ponzi scheme."[11]

---

[8] The evidence at Adams's sentencing established that of the $164.5 million that Madison Timber received in its last year of operation, it paid back approximately $79.5 million, leaving an $85 million difference.  The outstanding principal and interest owed to investors is necessarily higher.
[9] Doc. 11, United States v. Adams, No. 3:18-cr-00088 (S.D. Miss.).
[10] Doc. 21, United States v. Adams, No. 3:18-cr-00088 (S.D. Miss.).
[11] Doc. 3, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss.).

24. The promissory notes sold by Madison Timber to investors were "securities," as that term is defined under 15 U.S.C.A. §78(c)(A)(10) and Miss. Code Ann. § 75-71-102(28).

25. As alleged in the complaint in the underlying action *Securities & Exchange Commission v. Arthur Lamar Adams et al.*, No. 3:18-cv-252 (S.D. Miss.), and in the bill of information filed against Adams in *U.S. v. Arthur Lamar Adams*, No. 3:18-cr-88 (S.D. Miss.), Adams, Madison Timber, and their affiliates facilitated sales of promissory notes to investors through material misstatements and omissions; employed a device, scheme, or artifice to defraud; and engaged in acts, practices, or courses of business that operated or would operate as a fraud or deceit, all in violation of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(A); Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder; as well as the Mississippi Securities Act, Miss. Code Ann. § 75-71-501.

26. The sales furthermore violated the Securities Act of 1933 and the Mississippi Securities Act because there were no registration statements for the promissory notes, *see* Section 5 of the Securities Act of 1933, 15 U.S.C § 77e, and Miss. Code Ann. § 75-71-301; and the promissory notes were not exempt from registration, *see* Section 5 of the Securities Act of 1933, 15 U.S.C § 77e, and Miss. Code Ann. §§ 75-71-201 through 75-71-203.

## TRUSTMARK

27. For most of the time period in question, Trustmark was Adams's personal bank. Adams opened accounts at Trustmark for Madison Timber Company and Madison Timber Properties in 2009 and 2012, respectively. Until October 2016, Trustmark was the primary bank through which Adams conducted Madison Timber's business.

28. Trustmark enabled and sustained the Madison Timber Ponzi scheme by facilitating the financial transactions on which Madison Timber relied—payments to and from its investors;

payments to and from its recruiters; and transfers, or "loans," to and from Adams and Madison Timber that masked Madison Timber's insolvency.

29.     The Receiver obtained documents from Trustmark earlier this year after repeated requests. Those documents show that for years Trustmark suspected that Madison Timber was a Ponzi scheme but did nothing. After Trustmark confirmed that Madison Timber was a Ponzi scheme and confronted Adams, it gave Adams time to move Madison Timber's business elsewhere and even agreed to extend Adams's line of credit to make the move easier.

**Bankers and friends**

30.     Adams's primary bankers at Trustmark were Bennie Butts and Jud Watkins.

31.     Adams, Butts, and Watkins's relationships were more than professional—they were close friends.  They expanded each other's business and social networks by introducing each other to their personal business partners and friends. They regularly met for lunch or drinks, often Trustmark's "treat," to discuss Adams's business as well as their shared social interests, which included primarily golf and Ole Miss sports. Butts and Watkins often requested from Trustmark tickets to special events that they gave to Adams.

32.     Adams rewarded Butts and Watkins with his business, which was substantial. In addition to his Madison Timber business, Adams "brought" to Trustmark several "deals" by which he bought and sold land using separate LLCs he formed for those purposes. These separate LLCs included Confederate Dline, LLC; 747, LLC; Wolf Lake, LLC; KAB, LLC; Swede Camp, LLC; MASH Farms, LLC; and Delta Farm Land Investments, LLC. Incidentally, Rawlings & MacInnis, P.A., a defendant in the lawsuit styled *Alysson Mills vs. The UPS Store, Inc., et al.*, No. 3:19-cv-00364 (S.D. Miss.), who is alleged to have notarized Adams's fake timber deeds, formed these separate LLCs for Adams and provided the legal and title work for their purchases of land.

Of course, to the extent Adams put money into these separate LLCs, the money was investor money—proceeds from the Madison Timber Ponzi scheme.

33.     Trustmark provided Adams financing for Adams's separate "deals." Adams often had business partners in these "deals," and he bragged to them about his relationship with Trustmark. He wrote in an email in April 2009: "I have done 2 deals with Bennie [Butts] this year and have been very pleased in how he does things and works with me. They are very accommodating and seem to genuinely enjoy doing business." In another email he emphasized: "We have a comfort zone with Trustmark."  Trustmark benefited from the business that Adams drove to it.

34.     To Trustmark, and to Bennie Butts especially, Adams lavished praise. In one email Adams thanked Butts for "understanding" his business: "Just wanted to tell you how much we appreciate your hard work and efforts on helping us . . . . I know it was a long haul and a complicated deal to do the way it was structured.  Thanks for staying with it and getting an understanding of it."  In another email, Adams wrote: "Trustmark has been mighty good to me over the past several years and I look forward to bringing more business deals like these to the Bank." Butts replied: "Lamar, Jud and I value our relationship with you and appreciate you allowing Trustmark to assist you with your Banking Needs."

35.     In other instances, Adams commended Trustmark employees who had assisted him in other ways.  Of an employee in Trustmark's wiring department, Adams said "[he] treats us as if he never wants to lose our business":

> Bennie: just wanted to let you know how impressive [employee] in y'all's wiring department is.  This guy is so sharp and goes out of his way to accommodate us.  He goes "above and beyond". People always get criticism but never approbation.  This man acts like he owns Trustmark and treats us as if he never wants to lose our business. We have been so impressed we took him to lunch this past Monday. . . . I think Trustmark should know what a jewel they have in this man.

For the employee's attention to Adams's needs, Trustmark named him a "Service Star."

### Madison Timber, suspicions and cover

36.     While they nurtured their relationship with Adams and financed his separate "deals," when presented with Madison Timber's suspicious account activity, Butts and Watkins looked the other way or, worse, provided Adams cover.

37.     Throughout this time period Trustmark, Butts, and Watkins collected fees for their facilitation of the financial transactions that made the Madison Timber Ponzi scheme possible. Every month, Trustmark watched investors' money flow into Madison Timber by wire and check. On the first and the fifteenth of every month, Trustmark watched the money flow back out again by wire and check. Anyone could see the tell-tale pattern.

38.     Anyone could see that all of the money in Madison Timber's account came from and went back to the same people. The money never came from lumber mills.

39.     Madison Timber's purported business was selling timber to lumber mills, but the financial statements prepared by his accountant did not show any account receivables from lumber mills.   Adams explained to Butts and Watkins: "Guys, [my accountant] doesn't include my Account Receivables from the Mills on my end of year Balance Sheet because of the different dates of the Contracts."   Adams separately provided his own list of "MTP Receivables" to Butts and Watkins, which they accepted as sufficient.

40.     Sometimes Adams made suspiciously large cash deposits in Madison Timber's account.   To avoid questioning, he developed the habit of first contacting Butts and Watkins so they could alert branch office managers who otherwise would view the deposits as suspicious.

41.     Madison Timber's account was routinely overdrawn by large amounts, sometimes as much as several hundred thousands of dollars, sometimes several times in the same thirty-day

period.[12]   Trustmark waived for Madison Timber the substantial fees that any other customer would have to pay for the overdraws. Watkins defended the overdraws in a November 2013 email to his colleagues, turning cause for alarm into a business opportunity, proposing a revolving line of credit for Adams:

> Madison Timber is Lamar Adams' company.  From time to time Lamar will have multiple items hitting the OD report. When this occurs he completes a deposit the same day. I think he has operated in this fashion for some time. Bennie [Butts] might be able to shed more light. Ideally I think Madison Timber would be a good candidate for a $100M RLOC with a sweep.  That would solve the last minute transfers into the account. I haven't reviewed Madison Timber's financials, but they do run a considerable amount of money through their Trustmark account and they keep average deposits of $192M.

42.     As Madison Timber grew, its account activity grew more suspicious. In March 2014, a Trustmark employee responsible for reviewing accounts annually emailed Butts to report "Madison Timber's account still looks a little suspicious":

> Benny, my yearly review of Madison Timber's account still looks a little suspicious, the deposit amounts have increased immensely and still checks from the Trustmark account deposited a day earlier at Bank Plus which implies floating on the account.  If you are still comfortable with the customer please let me know.

Butts replied: "jud watkins is the servicing officer, but I am still in the loop. Let me visit with jud and let's you, jud, and me talk next week." Presumably Butts and Watkins allayed the employee's concerns.

43.     By June 2014, Wanda Moncrief, Trustmark's BSA/AML (Bank Secrecy Act/Anti-Money Laundering) Officer, had been alerted to Madison Timber's suspicious activity. She observed that in March 2013 Trustmark had noticed that each month Adams wrote two checks from his personal account to Wayne Kelly in the amount of $9,333. Adams told Trustmark at the time that payments to Kelly were for "consulting" and that Adams saved "tax money" by making the payments from his personal account. Trustmark found the answers suspicious and inquired

---

[12] For example, the account was overdrawn -$133,126 on August 4, 2016; -$228,730 on August 18, 2016; and -$204,165 on September 2, 2016.

again months later.  This time Adams told Trustmark that Kelly "pays the loggers" when he is out

of town, and the payments reimburse Kelly.  Moncrief wrote Butts: "I know that you know this

customer and his business well. . . . The answers do not make sense in relation to the business. . . .

Please call me to discuss."

44.     Butts promised Moncrief he would discuss the issues with Adams.  Butts and

Adams must have agreed that Adams would reach out to Moncrief directly because Butts shared

Moncrief's contact information with Adams, and Adams began communicating with Moncrief

himself.  Butts joked to Watkins: "If anybody can have Wanda eating out of his hand it might be

Lamar."

45.     In May 2015 Moncrief had new questions regarding Adams's and Madison

Timber's business.  The questions related to Kelly's work for Madison Timber as well as the

nature of ingoing and outgoing transactions:

> 1. What does Wayne Kelly do relative to the business? I see a lot of checks written
> to Kelly Management which is Wayne's business? What work is he paid for and
> when is he paid relative to the timber investments and cuttings? Yesterday Bennie
> stated he was a small shareholder employee but we see that he writes as many
> checks out as Mr. Adams does and he also writes checks back to the business on a
> regular basis from his business account for Kelly Management, LLC (BankPlus
> account). This seems to contradict the "small shareholder employee" status.
>
> 2. Why are multiple checks written to various individuals that clear at other banks –
> but then an amount close to the total written to those other individuals comes
> immediately back into the MadisonTimber account via wire for almost the same
> amount? NOTE – the check dates are within one to two days of the wire.
>
> 3. Why are so many checks written in the same amount to multiple individuals or to
> the same individual? i.e. $9,333.33,  $4,666.66,  $9,500.00,  $7,062.50, etc.
> Likewise, what are the numbers in the memo lines of the checks and what do they
> mean? "1, 2, 3, 4, or etc".

46.     Moncrief directed her questions to Butts, but Butts simply forwarded them to Adams.  Butts told Adams he did not know what "BSA-AML" (Bank Secrecy Act/Anti-Money Laundering) stood for:

> Lamar,
> Below are the questions that are [sic] BSA-AML Department asked in case you want to look over before Lunch today.  Not sure what all the initials stand for, but I will try to find out.  We look forward to seeing you at Lunch today.  Please let us know if you have questions.

Butts and Adams met for lunch and immediately after Adams provided a written response to Moncrief's questions.  In a follow-up exchange, Moncrief asked Adams for "a copy of one of the promissory notes used when people invest in a track of timber." Adams obliged and added: "BTW, those documents were done by Baker Donelson Law Firm, as they have 2 lawyers that Joint Venture timber tracts with us."

47.     In October 2015 Kelly emailed Butts to commend an employee in Trustmark's wiring department for her "fantastic" work for Madison Timber:

> Bennie, I want to take a moment and tell you what a fantastic job [employee] in your wiring department has done and continues to do for Madison Timber.  As you know Madison Timber deals with several wires on a monthly basis. [Employee] has always gone above and beyond to take care of us at Madison Timber. We appreciate her professionalism and all that she does to keep Madison Timber on track!

For the employee's attention to Madison Timber, Trustmark named her a "Service Star."

**2016**

48.     In June 2016, Moncrief reviewed Madison Timber's account activity again.  This time she zeroed in on the absence of income from lumber mills.  She asked Butts, "[C]an [Adams] confirm who or what entities he sells timber to after purchasing the timber from land owners? We cannot identify timber companies . . . "

14

49.     Moncrief emailed Adams herself, asking, "[W]hat timber companies do you use to harvest timber? We think we can't see part of the transactions – we do not see any incoming payments from timber companies. How do they primarily pay Madison Timber, what account are timber payments deposited into, etc?"  When Adams did not answer the first time, Moncrief followed up again: "One final question – in regards to the timber companies you contract with. We almost never see any incoming payments from them into the Madison Timber account. Where do payments go? Into another account at another bank perhaps?"  Adams bluffed an answer to the question, following Moncrief's lead: "Yes. I keep those separate and use 3 other Banks."

50.     On October 4, 2016, Trustmark personnel met privately to discuss Adams and Madison Timber. On October 5, 2016, Mel Channel, Trustmark's Senior Vice President of Director-Corporate Security, called Adams to ask him to close his account.  He advised Adams that he would give him at least 30 days, or until November 7, 2016, to move Madison Timber's business to another bank.

51.     Butts later called Trustmark's decision "the biggest disappointment" in his career. He pleaded with Channel to give Adams a chance to explain.

52.     Channel gave Adams and Kelly a chance to explain at a meeting at Trustmark on October 11, 2016. Unsatisfied by Adams's answers, Trustmark did not revisit its prior decision to ask Adams to move Madison Timber's business to another bank.

53.     Trustmark did, however, agree to extend Adams's personal line of credit by an additional 30 days from its November 30, 2016 maturity date to assist Adams with the transition.

54.     The transition was not as simple as opening a new account.  Adams and Kelly had given investors pre-dated checks, in future amounts due under their promissory notes, all written

from Madison Timber's account at Trustmark.  Madison Timber's recruiters had to scramble to collect the outstanding pre-dated checks before their investors attempted to cash them.

**Indicia of fraud**

55.     Madison Timber's account at Trustmark was the primary account through which Adams conducted Madison Timber's business until October 2016.  Adams deposited investors' money into the account and made monthly payments to investors out of the account for years.

56.     From their advantageous positions, Trustmark, Butts, and Watkins could see all the indicia of fraud but chose to look away or, worse, to provide cover.

57.     Trustmark, Butts, and Watkins could see that Adams's personal financial statements reported a positive net worth by grossly inflating the value of Adams's interests in his separate LLCs. They would have known that no independent appraisals would have supported those inflated values.

58.     Trustmark, Butts, and Watkins could see that Adams's tax returns showed substantial carry-forward business losses in addition to substantial debt because Madison Timber's purported interest expense nearly equaled its fictitious reported "profits."

59.     Trustmark, Butts, and Watkins knew that Madison Timber purported to purchase timber with investors' money because Trustmark, Butts, and Watkins knew their customers. Trustmark, Butts, and Watkins knew that Adams and Madison Timber purported to have timber deeds and cutting agreements between landowners and Madison Timber and contracts between Madison Timber and mills.

60.     But Trustmark, Butts, and Watkins could easily see that none of the hundreds of millions of dollars of investor money that was deposited into Trustmark's Madison Timber

account was ever used to purchase timber.  Trustmark, Butts, and Watkins could easily see that Trustmark's Madison Timber account never received any money from any mills.

61.     Trustmark, Butts, and Watkins knew that Adams and Madison Timber guaranteed a 13% return—better than any return for any other asset-backed investment. Trustmark, Butts, and Watkins knew that Adams and Madison Timber purported to have identified mills with an insatiable demand for timber at uniform prices.

62.     But as a financial institution and professionals with special sophistication and experience, Trustmark, Butts, and Watkins easily knew that Madison Timber's high and consistent returns over such a long period of time were implausible.

63.     Trustmark, Butts, and Watkins were required, pursuant to U.S. anti-laundering laws and regulations, to investigate suspicious and potentially illegal banking activity. Adams's suspicious activity did raise Trustmark's suspicions, as early as 2013.  Trustmark, Butts, and Watkins knew or should have known that Adams was engaged in illegal banking activity.

64.     In short, Trustmark, Butts, and Watkins had before them the nuts and bolts of the Madison Timber Ponzi scheme: large and highly suspicious transfers of money; routine and large overdrafts; implausibly high and consistent guaranteed returns; no purchases of timber; and no money received from any mills.  Trustmark, Butts, and Watkins had unique information from which they could have reached only one conclusion: Madison Timber was a fraud.

65.     Trustmark, Butts, and Watkins could have stopped the fraud years before it ensnared unwitting investors, including Trustmark customers, but instead they chose to enable and sustain Madison Timber by providing banking services that gave to Adams and Madison Timber the imprimatur of a sophisticated financial institution.  After they confirmed that Madison Timber was a Ponzi scheme and confronted Adams, they gave Adams time to move Madison Timber's

business elsewhere.  By their silence, Trustmark, Butts, and Watkins lent legitimacy and cover to Adams and Madison Timber while they collected fees for their facilitation of the largest Ponzi scheme in Mississippi's history.

## AFTER TRUSTMARK

66.     After Adams closed Madison Timber's account at Trustmark, he opened for Madison Timber new accounts at three different banks: First National Bank of Clarksdale ("FNBC"), RiverHills, and Southern Bancorp. Whereas before Adams used the single Trustmark account to conduct Madison Timber's business, now he used different accounts to deposit investors' money and pay investors back.

67.     Madison Timber's relationship with FNBC, RiverHills, and Southern Bancorp began no later than October 2016 and continued until Madison Timber's collapse on April 19, 2018. During this critical time period, FNBC, RiverHills, and Southern Bancorp enabled and sustained the Madison Timber Ponzi scheme by facilitating the financial transactions on which Madison Timber relied—payments to and from its investors; payments to and from its recruiters; and transfers, or "loans," to and from Adams and Madison Timber that masked Madison Timber's insolvency.

68.     Madison Timber currently has 501 outstanding promissory notes.  All or virtually all of the money investors gave to Adams and Madison Timber for those 501 outstanding promissory notes passed through Madison Timber's accounts at FNBC, RiverHills, and Southern Bancorp, where it was commingled and washed.  More than $164 million passed through these accounts in Madison Timber's last year of operation alone.

**FNBC**

69.     The FNBC Madison Timber account became the primary account in which Madison Timber's investors' money was deposited. Madison Timber promptly issued new wiring instructions to investors that directed them to wire their money to FNBC. Almost immediately, FNBC received hundreds of thousands of dollars in wires from across the country, all destined for the FNBC Madison Timber account.

70.     After he received investors' money in the FNBC Madison Timber account, Adams typically moved it to accounts at Southern Bancorp and RiverHills.

71.     FNBC is not a defendant in this lawsuit because, when confronted with the Receiver's claims, FNBC entered a settlement agreement with the Receivership Estate.

**Southern Bancorp**

72.     Adams controlled several accounts at Southern Bancorp, including one Madison Timber account and two accounts in his own name.

73.     Although Madison Timber's investors' money was directly deposited primarily into the FNBC Madison Timber account, sometimes investors' money was directly deposited into the Southern Bancorp Madison Timber account.

74.     Adams moved investors' money from FNBC to all three Southern Bancorp accounts, and moved money between the three Southern Bancorp accounts.

75.      From the three Southern Bancorp accounts, Adams moved some money to RiverHills, from which he made monthly payments back to investors—but he used a lot of the money for his personal expenses and business.  Using investors' money, Adams made loan payments, paid credit card bills, and even made charitable gifts out of the accounts in his own name.

76.     The activity in the Southern Bancorp accounts was erratic, and the month of March 2018 is indicative. In that month Adams made 24 deposits to the Southern Bancorp Madison Timber account, all in round numbers—for example, $100,000; $500,000; $1,000,000.  Anyone could see the money flowed in—primarily from FNBC—and then flowed right back out.  The account's balance that month started at $32,343; rose to $2,718,843 on March 13; fell to $213,723 on March 19; rose to $1,595,443 on March 27; and fell to $371,693 on March 30.

77.     On March 13, 2018, the Southern Bancorp Madison Timber account received deposits in the amounts of $1,500,000, $300,000, $500,000, and $200,000.  The very next day, Adams wired $2,000,000 out of the account to RiverHills. On March 30, 2018, the Southern Bancorp Madison Timber account received a deposit in the amount of $1,000,000.  The same day Adams wired $1,000,000 back out.

**RiverHills**

78.     The RiverHills Madison Timber account was the primary account from which Madison Timber's investors were paid by wire and check.

79.     When Adams opened the RiverHills Madison Timber account in October 2016, Jud Watkins, Adams's former banker at Trustmark, had already relocated there. To explain Madison Timber's change of banks, Mike Billings, one of Madison Timber's recruiters, told investors that "[o]ur banker of some twenty plus years left Trustmark Bank, and we of course went with him."

80.     Watkins was glad to have Adams's business and now Wayne Kelly's too.  He bragged to a colleague that Adams and Kelly were financially "very strong" customers and he would grow RiverHills's relationship with them.

20

81.     Watkins immediately extended home equity lines of credit to Adams and Kelly. Adams used his line of credit to move money into the RiverHills Madison Timber account when he needed it to pay investors.

82.     Like clockwork, every first and fifteenth day of the month, Adams made monthly payments to investors.  The wires were numerous and required careful attention.  RiverHills's employees took turns attending to them.  The assigned employees started preparing the wires at 3:00 p.m. on the business day before the wires were scheduled to issue. RiverHills's employees were so attentive they sometimes caught mistakes in Madison Timber's wiring instructions to them.

83.     RiverHills prided itself on its efficiency.  When RiverHills's employees made a mistake, Watkins wrote an eight-paragraph letter addressed to Adams and Kelly offering a formal apology.  Among other things, the letter observed that RiverHills had "facilitated an average of 120 wire transfer transactions each month for [Madison Timber]" and "d[id] not take lightly" that responsibility:

> Lamar and Wayne,
>
> First, please allow us to take this opportunity to apologize to you both for the error involving the recent wire transfers to [the investor's] account. We understand how important [the investor's] relationship is to your company.  We want to assure you that we value both you and your business in that same regard.
>
> Yesterday, we were very concerned to learn of the difficulties you encountered over the last few days regarding a series of wire transfers originating on October 23rd. Madison Timber Properties is considered a core customer of RiverHills Bank. Your relationship is invaluable to us. As you know, since moving your accounts to our institution nearly one year ago we have facilitated an average of 120 wire transfer transactions each month for your company without error.  Our goal is 100% accuracy.
>
> * * *
>
> Although errors can happen from time to time, the most important piece that was missing in this situation was communication. We firmly believe that timely communication would have mitigated the circumstance surrounding this issue. We

stressed to . . . our internal employees, that accurate and timely communication to our customers is a non-negotiable and of primary importance in maintaining a satisfactory relationship.

If either of you [or the investor] have any further concerns regarding our institution and our wire transfer process we would welcome the opportunity to share information at your nearest convenience. Thank you for placing your trust in RiverHills to handle these important transactions for your company. It is a responsibility that we do not take lightly. Thank you for banking with us.

Watkins knew the letter was intended to soothe not Adams or Kelly but the affected investor.

Adams thanked Watkins in an email, adding: "This will really help us out . . . . We are appreciative of you[r] efforts on our behalf. We love the relationship and hope to continue it for a very long time."

84.     Anyone could see that the money flowed into the RiverHills Madison Timber account—primarily from FNBC and Southern Bancorp but also from Adams's RiverHills line of credit—and then flowed right back out. Again, the month of March 2018 is indicative. The RiverHills Madison Timber account's balance started at $5,599,637 on March 1 and ended at $5,532,111 on March 31.  In between those two dates, the account received thirty deposits totaling $15,414,790, and made 340 payments totaling $15,482,316.

85.     From Madison Timber's FNBC account alone, the RiverHills Madison Timber account received wires in the amounts of $3,600,000 on February 28; $1,500,000 on March 2; $300,000 on March 6; $200,000 on March 7; $550,000 on March 8; $75,000 on March 14; $275,000 on March 16; $100,000 on March 19; $1,800,000 on April 2; $150,000 on April 6; and $1,500,000 on April 17.  Adams surrendered on April 19, and the account was frozen.

86.     After rumors of RiverHills's relationship with Adams and Madison Timber spread, a friend asked Watkins if RiverHills was "going to be ok."  Watkins answered: "Yeah. We're fine. No risk of loss. Long story."

**Indicia of fraud**

87. From their advantageous positions, Southern Bancorp, RiverHills, and Watkins could see all the indicia of fraud but chose to look away.

88. Southern Bancorp, RiverHills, and Watkins could see that Adams's personal financial statements reported a positive net worth by grossly inflating the value of Adams's interests in his separate LLCs. They would have known that no independent appraisals would have supported those inflated values.

89. Southern Bancorp, RiverHills, and Watkins could see that Adams's tax returns showed substantial carry-forward business losses in addition to substantial debt because Madison Timber's purported interest expense nearly equaled its fictitious reported "profits."

90. Southern Bancorp, RiverHills, and Watkins knew that Madison Timber purported to purchase timber with investors' money because Southern Bancorp, RiverHills, and Watkins knew their customers. Southern Bancorp, RiverHills, and Watkins knew that Adams and Madison Timber purported to have timber deeds and cutting agreements between landowners and Madison Timber and contracts between Madison Timber and mills.

91. But Southern Bancorp, RiverHills, and Watkins could easily see that none of the hundreds of millions of dollars of investor money that flowed through Southern Bancorp's and RiverHills's Madison Timber accounts was ever used to purchase timber. Southern Bancorp, RiverHills, and Watkins could easily see that Southern Bancorp's and RiverHills's Madison Timber accounts never received any money from any mills.

92. Southern Bancorp, RiverHills, and Watkins knew that Adams and Madison Timber guaranteed a 13% return—better than any return for any other asset-backed investment. Southern

Bancorp, RiverHills, and Watkins knew that Adams and Madison Timber purported to have identified mills with an insatiable demand for timber at uniform prices.

93.     But as financial institutions with special sophistication and experience, Southern Bancorp, RiverHills, and Watkins easily knew that Madison Timber's high and consistent returns over such a long period of time were implausible.

94.     Southern Bancorp, RiverHills, and Watkins were required, pursuant to U.S. anti-laundering laws and regulations, to investigate suspicious and potentially illegal banking activity. Adams's large transfers of money to Madison Timber's accounts at Southern Bancorp and RiverHills would have raised any reasonable bank's suspicions. Southern Bancorp, RiverHills, and Watkins knew or should have known that Adams was engaged in illegal banking activity.

95.     In short, Southern Bancorp, RiverHills, and Watkins had before them the nuts and bolts of the Madison Timber Ponzi scheme: large and highly suspicious transfers of money; implausibly high and consistent guaranteed returns; no purchases of timber; and no money received from any mills.  Southern Bancorp, RiverHills, and Watkins had unique information from which they could have reached only one conclusion: Madison Timber was a fraud.

96.     Southern Bancorp, RiverHills, and Watkins could have stopped the fraud, but they chose instead to enable and sustain it by providing banking services that gave to Adams and Madison Timber the imprimatur of sophisticated financial institutions. By their silence, Southern Bancorp, RiverHills, and Watkins lent legitimacy and cover to Adams and Madison Timber while they collected fees for their facilitation of the largest Ponzi scheme in Mississippi's history.

## CAUSES OF ACTION

## COUNT I
## FOR CIVIL CONSPIRACY
## AGAINST ALL DEFENDANTS

97.     The Receiver re-alleges each of the foregoing paragraphs as though stated fully herein.

98.     Mississippi law defines a civil conspiracy as a "combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully." *Shaw v. Burchfield*, 481 So. 2d 247, 255 (Miss. 1985).

99.     Defendants conspired with Adams to commit the tortious acts alleged in this complaint.

100.    Madison Timber was a Ponzi scheme therefore Defendants and Adams's purpose was unlawful.

101.    In furtherance of their unlawful purpose, among other overt acts, Defendants facilitated the financial transactions on which Madison Timber relied—payments to and from its investors; payments to and from its recruiters; and transfers, or "loans," from Adams that masked Madison Timber's insolvency.

102.    From their advantageous positions, Defendants could see all the indicia of fraud but chose to look away.  Defendants had before them the nuts and bolts of the Madison Timber Ponzi scheme: large and highly suspicious transfers of money; implausibly high and consistent guaranteed returns; no purchases of timber; and no money received from any mills.  Defendants had unique information from which they could have reached only one conclusion: Madison Timber was a fraud.

25

103.    Defendants could have stopped the fraud but chose instead to enable and sustain it by providing banking services that gave to Adams and Madison Timber the imprimatur of sophisticated financial institutions.  By their silence, Defendants lent legitimacy and cover to Adams and Madison Timber while they collected fees for their facilitation of the largest Ponzi scheme in Mississippi's history.

104.    Defendants were essential to the growth of the Madison Timber Ponzi scheme.  In a Ponzi scheme, "the harms arise from a singular scheme, not isolated acts—that is, from a composite of conduct by numerous conspirators taken over many years, collectively establishing and perpetrating the fraud."[13] Defendants are part of that composite here.  But for Defendants' encouragement and assistance, Madison Timber would not have continuously grown—it would have failed before ensnaring hundreds of new unwitting investors.

105.    Madison Timber's debts are now the Receivership Estate's. Defendants contributed to Madison Timber's success over time, and therefore to the Receivership Estate's liabilities today. Defendants and Adams's civil conspiracy is a proximate cause of the debts of the Receivership Estate.

106.    Defendants are jointly and severally liable for the debts of the Receivership Estate, which their and Adams's civil conspiracy proximately caused.

107.    Because Defendants acted with reckless disregard of the wellbeing of others, and in specific instances described in this complaint committed actual fraud, punitive damages are appropriate.

---

[13] *Zacarias v. Stanford Int'l Bank, Ltd.*, 931 F.3d 382, 397 (5th Cir. 2019), *opinion withdrawn and superseded on reh'g,* No. 17-11073, 2019 WL 6907376 (5th Cir. Dec. 19, 2019).

## COUNT II
## FOR AIDING AND ABETTING
## AGAINST ALL DEFENDANTS

108.   The Receiver re-alleges each of the foregoing paragraphs as though stated fully herein.

109.   The Restatement (Second) of Torts § 876(b) (1979) provides that a defendant is liable if he "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." Stated differently, a defendant is liable for aiding and abetting the wrongful conduct of another.

110.   Defendants aided and abetted Adams in committing breaches of duties owed by him to Madison Timber and in other tortious conduct alleged in this complaint.

111.   As financial institutions with special sophistication and experience, Defendants knew that Adams owed Madison Timber fiduciary duties of care. Mississippi law requires the manager of a limited liability company to discharge his duties in good faith and with fair dealing, with prudence, and in a manner that he reasonably believed was in the best interests of the company.[14] Nevertheless, Adams misused Madison Timber to sustain a singular fraud over many years, and Defendants assisted him.

112.   Defendants aided and abetted Adams by, among other things, facilitating payments to and from Madison Timber's investors; payments to and from Madison Timber's recruiters; and transfers, or "loans," from Adams that masked Madison Timber's insolvency.

113.   From their advantageous positions, Defendants could see all the indicia of fraud but chose to look away. Defendants had before them the nuts and bolts of the Madison Timber Ponzi scheme: large and highly suspicious transfers of money; implausibly high and consistent

---

[14] MISS. CODE ANN. § 79-29-123(6)(a).

27

guaranteed returns; no purchases of timber; and no money received from any mills.  Defendants had unique information from which they could have reached only one conclusion: Madison Timber was a fraud.

114.    Defendants could have stopped the fraud but chose instead to enable and sustain it by providing banking services that gave to Adams and Madison Timber the imprimatur of sophisticated financial institutions.  By their silence, Defendants lent legitimacy and cover to Adams and Madison Timber while they collected fees for their facilitation of the largest Ponzi scheme in Mississippi's history.

115.    Defendants were essential to the growth of the Madison Timber Ponzi scheme.  In a Ponzi scheme, "the harms arise from a singular scheme, not isolated acts—that is, from a composite of conduct by numerous conspirators taken over many years, collectively establishing and perpetrating the fraud."[15] Defendants are part of that composite here.  But for Defendants' substantial assistance and encouragement, Madison Timber would not have continuously grown—it would have failed before ensnaring hundreds of new unwitting investors.

116.    Madison Timber's debts are now the Receivership Estate's. Defendants contributed to Madison Timber's success over time, and therefore to the Receivership Estate's liabilities today. Defendants' substantial assistance and encouragement is a proximate cause of the debts of the Receivership Estate.

117.    Defendants are jointly and severally liable for the debts of the Receivership Estate, which their substantial assistance and encouragement proximately caused.

---

[15] *Zacarias v. Stanford Int'l Bank, Ltd.*, 931 F.3d 382, 397 (5th Cir. 2019), *opinion withdrawn and superseded on reh'g,* No. 17-11073, 2019 WL 6907376 (5th Cir. Dec. 19, 2019).

118.    Because Defendants acted with reckless disregard of the wellbeing of others, and in specific instances described in this complaint committed actual fraud, punitive damages are appropriate.

## COUNT III
## FOR RECKLESSNESS, GROSS NEGLIGENCE, AND AT A MINIMUM NEGLIGENCE AGAINST ALL DEFENDANTS

119.    The Receiver re-alleges each of the foregoing paragraphs as though stated fully herein.

120.    "Negligence is a failure to do what the reasonable person would do under the same or similar circumstances." *Estate of St. Martin v. Hixson*, 145 So. 3d 1124, 1128 (Miss. 2014).

121.    While negligence is the failure to exercise due care, recklessness "is a failure or refusal to exercise any care."  *Maldonado v. Kelly*, 768 So. 2d 906, 910 (Miss. 2000).

122.    From their advantageous positions, Defendants could see all the indicia of fraud but chose to look away.  Defendants had before them the nuts and bolts of the Madison Timber Ponzi scheme: large and highly suspicious transfers of money; implausibly high and consistent guaranteed returns; no purchases of timber; and no money received from any mills.  Defendants had unique information from which they could have reached only one conclusion: Madison Timber was a fraud.

123.    A reasonable bank in same or similar circumstances would have stopped the fraud. Defendants chose instead to enable and sustain it by providing banking services that gave to Adams and Madison Timber the imprimatur of sophisticated financial institutions.

124.    Defendants not only failed to exercise due care, they failed or refused to exercise any care at all in their dealings with Madison Timber.

125.    Defendants' recklessness, or at a minimum negligence, allowed Madison Timber to continuously grow.  Madison Timber grew from an approximately $10 million-a-year Ponzi scheme in 2011 to an approximately $164.5 million-a-year Ponzi scheme as of April 19, 2018.

126.    Defendants were essential to the growth of the Madison Timber Ponzi scheme.  In a Ponzi scheme, "the harms arise from a singular scheme, not isolated acts—that is, from a composite of conduct by numerous conspirators taken over many years, collectively establishing and perpetrating the fraud."[16] Defendants are part of that composite here.  But for Defendants' recklessness, or at a minimum negligence, Madison Timber would not have continuously grown—it would have failed before ensnaring hundreds of new unwitting investors.

127.    Madison Timber's debts are now the Receivership Estate's. Defendants by their recklessness, or at a minimum negligence, contributed to Madison Timber's success over time, and therefore to the Receivership Estate's liabilities today. Defendants' recklessness, or at a minimum negligence, is a proximate cause of the debts of the Receivership Estate.

128.    Defendants are liable for the debts of the Receivership Estate, which their recklessness, or at a minimum negligence, proximately caused.

129.    Because Defendants acted with gross negligence evincing a reckless disregard of the wellbeing of others, punitive damages are appropriate.

---

[16] *Zacarias v. Stanford Int'l Bank, Ltd.*, 931 F.3d 382, 397 (5th Cir. 2019), *opinion withdrawn and superseded on reh'g,* No. 17-11073, 2019 WL 6907376 (5th Cir. Dec. 19, 2019).

## COUNT IV

## FOR NEGLIGENT RETENTION AND SUPERVISION
## AGAINST TRUSTMARK, SOUTHERN BANCORP, AND RIVERHILLS

130.     The Receiver re-alleges each of the foregoing paragraphs as though stated fully

herein.

131.     "[A]n employer will be liable for negligent hiring or retention of his employee

when an employee injures a third party if the employer knew or should have known of the

employee's incompetence or unfitness."  *Backstrom v. Briar Hill Baptist Church, Inc.*, 184 So. 3d

323, 327 (Miss. Ct. App. 2016).

132.     Defendants Butts and Watkins, agents of Defendants Trustmark and RiverHills,

and unknown agents of Defendant Southern Bancorp, assisted Adams by, among other things,

facilitating payments to and from Madison Timber's investors; payments to and from Madison

Timber's recruiters; and transfers, or "loans," from Adams that masked Madison Timber's

insolvency.

133.     Defendants Trustmark, Southern Bancorp, and RiverHills knew or should have

known of their agents' incompetence or unfitness.

134.     Defendants Trustmark, Southern Bancorp, and RiverHills were reckless, or at a

minimum negligent, in retaining their agents and failing to supervise their agents' dealings.

135.     Defendants Trustmark, Southern Bancorp, and RiverHills's recklessness, or at a

minimum negligence, allowed Madison Timber to continuously grow.  Madison Timber grew

from an approximately $10 million Ponzi scheme in 2011 to an approximately $164.5 million

Ponzi scheme on April 19, 2018.

136.     Defendants were essential to the growth of the Madison Timber Ponzi scheme.  In a

Ponzi scheme, "the harms arise from a singular scheme, not isolated acts—that is, from a

composite of conduct by numerous conspirators taken over many years, collectively establishing and perpetrating the fraud."[17] Defendants are part of that composite here. But for Defendants Trustmark, Southern Bancorp, and RiverHills's recklessness, or at a minimum negligence, Madison Timber would not have continuously grown—it would have failed before ensnaring hundreds of new unwitting investors.

137.     Madison Timber's debts are now the Receivership Estate's. Defendants Trustmark, Southern Bancorp, and RiverHills, by their recklessness, or at a minimum negligence, contributed to Madison Timber's success over time, and therefore to the Receivership Estate's liabilities today. Defendants Trustmark, Southern Bancorp, and RiverHills's recklessness, or at a minimum negligence, is a proximate cause of the debts of the Receivership Estate.

138.     Defendants Trustmark, Southern Bancorp, and RiverHills are liable for the debts of the Receivership Estate, which their recklessness, or at a minimum negligence, proximately caused.

139.     Because Defendants Trustmark, Southern Bancorp, and RiverHills acted with gross negligence evincing a reckless disregard of the wellbeing of others, punitive damages are appropriate.

---

[17] *Zacarias v. Stanford Int'l Bank, Ltd.*, 931 F.3d 382, 397 (5th Cir. 2019), *opinion withdrawn and superseded on reh'g,* No. 17-11073, 2019 WL 6907376 (5th Cir. Dec. 19, 2019).

## COUNT V

## FOR VIOLATIONS OF MISSISSIPPI'S FRAUDULENT TRANSFER ACT
## AGAINST ALL DEFENDANTS

140.     The Receiver re-alleges each of the foregoing paragraphs as though stated fully herein.

141.     The Receiver may avoid any transfer made in violation of the Mississippi Uniform Fraudulent Transfer Act (the "Act"), MISS. CODE ANN. §15-3-101, *et seq.*

142.     Pursuant to § 107 of the Act, the Receiver may recover from any party any funds that Madison Timber transferred with the actual intent to hinder, delay, or defraud any of its creditors. Because Madison Timber was a Ponzi scheme, by definition all transfers by Madison Timber were made with the actual intent to hinder, delay, or defraud its creditors.

143.     Madison Timber's liabilities always exceeded its assets, which were nonexistent, therefore it was insolvent when it paid any fees or other such payments to Defendants.

144.     Madison Timber received no legitimate value for the fees or other such payments it paid to Defendants. The perpetuation of a Ponzi scheme is not legitimate value.

145.     The Receiver is entitled to a judgment against Defendants returning to the Receivership Estate all fees and other such payments paid by Adams or Madison Timber to Defendants.

## COUNT VI

## FOR VIOLATIONS OF MISSISSIPPI'S RACKETEER INFLUENCED
## AND CORRUPT ORGANIZATION ACT
## AGAINST ALL DEFENDANTS

146.     The Receiver re-alleges each of the foregoing paragraphs as though stated fully herein.

147.    Mississippi's RICO statute provides: "It shall be unlawful for any person to conduct, organize, supervise or manage, directly or indirectly, an organized theft or fraud enterprise."  MISS. CODE ANN. § 97-43-3.1.

148.    Madison Timber was a "fraud enterprise" within the meaning of Mississippi's RICO statute because "fraud enterprise" includes one conducted by "mail or other means of communication," MISS. CODE ANN. § 97-43-3.1, and Adams was convicted of wire fraud.

149.    Mississippi's RICO statute further provides: "It is unlawful for any person employed by, *or associated with*, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity. . . ."  MISS. CODE ANN. § 97-43-5 (emphasis added).  "'Racketeering activity' means to commit, to attempt to commit, to conspire to commit . . . any crime which is chargeable under [Mississippi's RICO statute]," MISS. CODE ANN. § 97-43-3, including wire fraud.

150.    Defendants participated, directly or indirectly, in the Madison Timber "fraud enterprise."

151.    Defendants' participation allowed the Madison Timber "fraud enterprise" to continuously grow.  Madison Timber grew from an approximately $10 million-a-year Ponzi scheme in 2011 to an approximately $164.5 million-a-year Ponzi scheme as of April 19, 2018.

152.    But for Defendants' participation, the Madison Timber "fraud enterprise" would not have continuously grown—it would have failed before ensnaring hundreds of new unwitting investors.

153.    By Defendants' participation, they contributed to Madison Timber's success over time, and therefore to the Receivership Estate's liabilities today. Defendants' participation is a proximate cause of the debts of the Receivership Estate.

154.    Defendants therefore are liable for "threefold the actual damages sustained" by the Receivership Estate, punitive damages, and attorneys' fees.

## TRUSTMARK AND RIVERHILLS'S
## VICARIOUS LIABILITY

155.    The apparent backing of Defendants Trustmark and RiverHills enabled Butts and Watkins, among others, to assist Adams by, among other things, facilitating payments to and from Madison Timber's investors; payments to and from Madison Timber's recruiters; and transfers, or "loans," from Adams that masked Madison Timber's insolvency. Defendants Trustmark and RiverHills are liable for the negligent and reckless acts of their agents, including but not limited to Butts and Watkins.

———————————

WHEREFORE, the Receiver respectfully requests that, after due proceedings, including a trial by jury, the Court enter judgments:

1.   awarding damages, including punitive damages, in her favor and against Trustmark, Bennie Butts, Jud Watkins, Southern Bancorp, and RiverHills jointly and severally;

2.   awarding any and all attorney's fees, costs, and interest allowed by contract or law; and

3.   awarding any and all other relief as may be just and equitable.

December 30, 2019

Respectfully submitted,

*/s/ Lilli Evans Bass*

BROWN BASS & JETER, PLLC
Lilli Evans Bass, Miss. Bar No. 102896
1755 Lelia Drive, Suite 400
Jackson, Mississippi 39216
Tel: 601-487-8448
Fax: 601-510-9934
bass@bbjlawyers.com
*Receiver's counsel*

*/s/ Brent B. Barriere*

FISHMAN HAYGOOD, LLP
*Admission pro hac vice pending*
Brent B. Barriere, *Primary Counsel*
Kristen D. Amond
Rebekka C. Veith
201 St. Charles Avenue, Suite 4600
New Orleans, Louisiana 70170
Tel: 504-586-5253
Fax: 504-586-5250
bbarriere@fishmanhaygood.com
kamond@fishmanhaygood.com
rveith@fishmanhaygood.com
*Receiver's counsel*

36