IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**ALYSSON MILLS,** *in her capacity as receiver for Arthur Lamar Adams and Madison Timber Properties, LLC*                                   PLAINTIFF

V.                                                              CAUSE NO. 3:19-CV-941-CWR-FKB

**TRUSTMARK NATIONAL BANK;**                                   DEFENDANTS
**BENNIE BUTTS; JUD WATKINS;**
**SOUTHERN BANCORP BANK; &**
**RIVERHILLS BANK**

**ORDER**

Before the Court are motions to dismiss filed by defendants Trustmark National Bank, Bennie Butts, Southern Bancorp Bank, and RiverHills Bank. The matters are fully briefed and ready for adjudication. After thorough review, the motions will be granted in part and denied in part.

**I.      Factual and Procedural History**

From at least 2010 until April 2018, Lamar Adams operated timber investment companies called Madison Timber Company LLC and Madison Timber Properties LLC. He told investors they were purchasing shares of timber tracts that would be harvested and sold to lumber mills at a significant profit. The demand for lumber was so great, he said, he could guarantee investors a fixed rate of return in excess of 10%. Investors believed him. They collectively gave him hundreds of millions of dollars.

Adams was lying. He had, with the help of others, faked everything about the scheme. There were no timber deeds, tracts of land, or lumber mills. He was actually using new investors' money to pay old investors—a classic Ponzi scheme. It worked only as long as Adams and his associates could continue to bring in new money.

The scheme collapsed in April 2018. Adams turned himself in to the United States Attorney's Office in Jackson, Mississippi and quickly pleaded guilty to wire fraud. He is now serving a 19.5-year sentence in federal prison. The sentence reflects the significance of the fraud; the criminal proceeding established that Adams' victims lost approximately $85 million.

When the Ponzi scheme collapsed, the U.S. Securities and Exchange Commission asked this Court to appoint a receiver to take charge of Adams' companies and provide some measure of financial relief to his victims. The Court appointed Alysson Mills to be that receiver. To date, she has sold Adams' assets, negotiated settlements with Adams' enablers, and filed lawsuits against persons and entities that contributed to the fraud.

This is one of those lawsuits.

In this action, the receiver alleges that Trustmark National Bank, Bennie Butts, Jud Watkins, Southern Bancorp Bank, and RiverHills Bank facilitated Adams' fraud. "Defendants could see Adams's fraud long before his surrender and confession on April 19, 2018," the receiver alleges, "but they looked away while they collected fees."

### *Trustmark, Butts, and Watkins*

The story begins with Trustmark and two of its longtime employees, Butts and Watkins. Trustmark was Madison Timber's bank from 2009 to 2016. Butts and Watkins handled the accounts.

Simply put, Adams ran the Ponzi scheme through Trustmark. Hundreds of thousands of dollars flowed into Madison Timber's account each month. The same month, hundreds of thousands of dollars flowed out. *New investors' money came in; old investors' money went out.* The idiom wash-rinse-repeat comes to mind. Everyone profited as long as Trustmark looked the other way, the receiver alleges.

2

These defendants' relationship with Adams is alleged to have been less than arm's length—infused by lunches, alcohol, and Trustmark-provided tickets to special events—because Adams was bringing so much business to Trustmark.[1] In exchange, Adams lavished Butts and his colleagues with praise. "We have a comfort zone with Trustmark," Adams wrote in one email. "They are very accommodating." The wiring department was singled out for special thanks.

If the pattern of transactions wasn't suspicious enough in its own right, the complaint suggests, Trustmark should have been worried by 2013.[2] In that year, Watkins had to defend to Trustmark officials Adams' practice of routinely overdrawing his accounts. The overdraws could be into six-figures and sometimes happened several times a month. Because it was for Adams, though, Trustmark waived the "substantial fees."

In June 2014, the bank's Bank Secrecy Act/Anti-Money Laundering (BSA/AML) Officer, Wanda Moncrief, having been alerted to Madison Timber's suspicious activity, got involved. Moncrief wrote Butts: "I know that you know this customer and his business well. . . . [Adams'] answers do not make sense in relation to the business. . . . Please call me to discuss." Adams apparently allayed her concerns directly, but Moncrief returned the next year with more specific concerns:

> Why are multiple checks written to various individuals that clear at other banks – but then an amount close to the total written to those other individuals comes immediately back into the MadisonTimber account via wire for almost the same amount? NOTE – the check dates are within one to two days of the wire. . . .
>
> Why are so many checks written in the same amount to multiple individuals or to the same individual? i.e. $9,333.33, $4,666.66, $9,500.00, $7,062.50, etc. Likewise, what are the numbers in the memo lines of the checks and what do they mean? "1, 2, 3, 4, or etc".

---

[1] His business was not limited to Madison Timber. The complaint alleges that Adams also "'brought' to Trustmark several 'deals' by which he bought and sold land using separate LLCs he formed for those purposes."
[2] We do not know precisely when Trustmark started to be concerned about Adams' scheme. In March 2014, a Trustmark employee told Butts that "Madison Timber's account still looks a little suspicious"—the word "still" implying that concerns had been raised before.

3

Docket No. 1 at 13. Butts forwarded the questions to Adams, adding that he wasn't sure what the initials "BSA/AML" stood for, but "look forward to seeing you at Lunch today." It is implausible that Butts, an experienced banker, did not know the industry's standard acronym for Bank Secrecy Act/Anti-Money Laundering.

Adams apparently dodged this inquiry by sending Moncrief one of the promissory notes he used to perpetuate the scheme. Yet a year later, Moncrief was back. In June 2016 she emailed Butts saying, "We cannot identify timber companies." She then emailed Adams additional questions: "We almost never see any incoming payments from them into the Madison Timber account. Where do payments go? Into another account at another bank perhaps?" Adams responded, "Yes. I keep those separate and use 3 other Banks."

Apparently the lies had stretched too far. On October 5, 2016, a Trustmark executive called Adams and asked him to close his accounts. It is not clear if Trustmark also alerted law enforcement or regulatory agencies about the Ponzi scheme, at this time or otherwise. In describing Trustmark's handling of the situation, however, the complaint suggests that the answer was "no, it did not." Because instead of shutting Adams down entirely, the bank helped Adams by giving him 30 days to move his business, and then extended Adams' personal line of credit by an additional month to facilitate his move.

Beyond the above indicia of fraud, the receiver alleges that Trustmark had additional, private information that revealed a Ponzi scheme. The bank had Adams' personal financial statements that grossly inflated the valuations of his separate LLCs. The bank had tax returns showing expenses that "nearly equaled [Madison Timber's] fictitious reported 'profits.'" And the bank knew that none of the money flowed into its accounts from timber companies. Yet the bank

4

permitted Adams to operate his Ponzi scheme. Then, when it became too obvious, the bank let him move the scheme to other financial institutions.

### *Southern Bancorp, RiverHills, and Watkins*

When Adams was forced to leave Trustmark, he picked up his Ponzi scheme and moved it to other banks. His gentle separation from Trustmark had been educational, the complaint suggests: Adams now knew that he could better disguise the scheme by using different banks for the incoming and outgoing funds. So he set up accounts at First National Bank of Clarksdale, Southern Bancorp Bank, and RiverHills Bank, and "washed" the money by making transfers between them.[3] The transition was aided by Adams' friend, Watkins, who left his employment at Trustmark and went to work at RiverHills to service the Madison Timber accounts.

With this setup Adams was able to continue the Ponzi scheme for another 18 months. The complaint alleges that "all or virtually all" of Madison Timber's 501 outstanding promissory notes involved transactions with these three banks. The scale of the operation exceeded $164 million in its final year.

The complaint suggests that Southern Bancorp and RiverHills cannot avoid liability by claiming ignorance. It alleges that Southern Bancorp both received and sent investor money, and that none of these transactions involved timber mills. Southern Bancorp and RiverHills routinely saw transactions of large round numbers, ranging from $100,000 to $1 million, going in and out in a single month. Sometimes the incoming and outgoing sums would almost equal each other.[4] RiverHills saw Adams move money from his personal lines of credit into his Madison Timber account.

---

[3] First National Bank of Clarksdale settled with the receiver without litigation.
[4] In March 2018, Adams moved $15,414,790 into the RiverHills account and $15,482,316 out of that account.

RiverHills is alleged to have set up shifts on the first and fifteenth of each month to process all the wires necessary to service the Ponzi scheme. Documents from Watkins to Adams show that approximately 120 wires were transacted each month. "Madison Timber Properties is considered a core customer of RiverHills Bank," he wrote. "Your relationship is invaluable to us." Adams replied, "We love the relationship and hope to continue it for a very long time."

As with Trustmark, the complaint alleges that Southern Bancorp, RiverHills, and Watkins had information from Adams' personal financial statements, tax returns, the unrealistic rate of return, and the absence of any timber mills on the wires, that gave them actual knowledge of a Ponzi scheme. The defendants allegedly looked away, profiting from the fees Adams' accounts were generating.

*   *   *

The receiver has a duty to "identif[y] and pursue[] persons and entities as participants in the Ponzi scheme to recover funds for distribution to investor-claimants." *Zacarias v. Stanford Int'l Bank, Ltd.*, 945 F.3d 883, 891 (5th Cir. 2019).

The receiver now alleges that Trustmark, Butts, Watkins, Southern Bancorp, and RiverHills "knew or should have known that Adams was engaged in illegal banking activity" and "could have stopped the fraud years before it ensnared unwitting investors," but "chose instead to enable and sustain it." She brings claims of civil conspiracy; aiding and abetting breach of fiduciary duty; negligence, gross negligence, and recklessness; fraudulent transfer; and racketeering against all of the defendants. As to the banks in particular, the receiver also brings a claim for negligent retention and supervision, adding that they are vicariously liable for their employees' actions.

After service of the complaint, Trustmark, Butts, Southern Bancorp, and RiverHills filed the present motions to dismiss.[5] Trustmark says this "offensive" suit shows that it acted "consistent with proper, lawful banking services and with due diligence." Butts says the receiver sued "as many people who had any dealings with Adams as possible in hopes of increasing the potential recovery for the victims she purports to represents," and that this action is "inequitable." Southern Bancorp seeks to discredit "investor[s] who knowingly signed up for a get-rich-quick scheme." RiverHills says this proceeding is an "injustice." "Fundamental fairness," RiverHills complains, "dictates that the burdens and cost of discovery not be used to extract a settlement."

## II.     Legal Standard

When considering a motion to dismiss under Rule 12(b)(6), the Court accepts the plaintiff's factual allegations as true and makes reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To proceed, the complaint "must contain a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* at 677-78 (quotation marks and citation omitted). This requires "more than an unadorned, the defendant-unlawfully-harmed-me accusation," but the complaint need not have "detailed factual allegations." *Id.* at 678 (quotation marks and citation omitted). The plaintiff's claims must also be plausible on their face, which means there is "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted).

A plaintiff who defeats a motion to dismiss does not automatically prevail. Defeating a motion to dismiss simply means that the plaintiff is entitled to discovery—a period in which the

---

[5] Watkins moved to compel arbitration. That motion will be taken up separately.

7

plaintiff and the defendants obtain evidence from each other and non-parties. After the close of discovery, the defendants are then entitled to file motions for summary judgment, in which they argue to the Court that, given all of the evidence, they are entitled to judgment as a matter of law. A plaintiff who defeats a motion for summary judgment also does not automatically prevail. Instead, the case is set for trial so that a jury may decide whether the plaintiff has proven her case.[6]

### III. Discussion

#### A. Standing

The defendants first contend that the receiver lacks standing to bring these claims.

The Constitution limits the jurisdiction of federal courts to actual cases and controversies. U.S. Const. art. III, § 2. Parties seeking to invoke federal-court jurisdiction must therefore demonstrate standing, which is shown by three elements: (1) an injury in fact that is concrete and particularized as well as imminent or actual; (2) a causal connection between the injury and the defendant's conduct; and (3) that a favorable decision is likely to redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). In a standing analysis, the Court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501-02 (1975).

The defendants' standing arguments are unpersuasive in light of the Fifth Circuit's decision in *Zacarias v. Stanford International Bank*. There, the appellate court upheld a federal equity receiver's standing to sue professionals who conspired with Allen Stanford to carry out a Ponzi scheme. The court found "no dispute" that the receiver had standing to bring such claims. 945 F.3d at 899. It reasoned as follows:

---

[6] The lawyers all know this procedure, but this paragraph is for the benefit of any Ponzi scheme victims who may read this Order.

8

> They bring only the claims of the Stanford entities—not of their investors—alleging injury to the Stanford entities, including the unsustainable liabilities inflicted by the Ponzi scheme. The receiver and Investors' Committee "allege that Defendants' participation in a fraudulent marketing scheme increased the sale of Stanford's CDs, ultimately resulting in greater liability for the Receivership Estate," and that defendants "harmed the Stanford Entities' ability to repay their investors." The receiver and Investors' Committee sought to recover for the Stanford entities' Ponzi-scheme harms, monies the receiver will distribute to investor-claimants. The district court had subject matter jurisdiction over these claims.

*Id.*

We are presented with the same essential structure here. The receiver has sued banks and bankers that, she alleges, conspired with the Ponzi scheme principals to further the Ponzi scheme and cause greater liabilities to the receivership estate. *See id.* at 901. She seeks to recover for injuries to the Madison Timber entities' "unsustainable liabilities inflicted by the Ponzi scheme," and distribute that money to investor-claimants. *Id.* at 899. As in *Zacarias*, there can be "no dispute" that she has standing.

The defendants argue that *Zacarias* is unhelpful because, they claim, no party to that suit challenged standing. But the judiciary has an independent duty to examine each case for compliance with subject matter jurisdiction prerequisites like standing. *See Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 398 (1979) ("[E]ven if not raised by the parties, we cannot ignore the absence of federal jurisdiction"); *Stallworth v. Bryant*, 936 F.3d 224, 229 (5th Cir. 2019) ("The Judicial Branch may not accept for adjudication claims of constitutional violation . . . where the claimant has not suffered cognizable injury."). Unlike every other issue, lack of standing can even be raised "for the first time" on appeal. *Stallworth*, 936 F.3d at 230 (dismissing cause of action for lack of standing on appeal). It follows that the *Zacarias* court necessarily considered and found standing when it issued a lengthy opinion about the jurisdiction of federal equity receivers.

Under this precedent, the receiver has standing.

**B.    Civil Conspiracy**

The defendants then argue that the receiver has failed to state a claim for civil conspiracy.

In Mississippi, "the elements of a civil conspiracy are: (1) an agreement between two or more persons, (2) to accomplish an unlawful purpose or a lawful purpose unlawfully, (3) an overt act in furtherance of the conspiracy, (4) and damages to the plaintiff as a proximate result." *Rex Distrib. Co., Inc. v. Anheuser-busch, LLC*, 271 So. 3d 445, 455 (Miss. 2019) (quotation marks and citation omitted).

Some of the defendants argue that the claim fails because they lacked actual knowledge that Adams was running a Ponzi scheme. Southern Bancorp, for example, says it was merely accepting "routine banking fees for routine banking services" in "good faith."

The evidence may very well bear this out.[7] The problem with the present argument is that the complaint plausibly alleges that the banks had actual knowledge of wrongdoing. The complaint specifically recites that the defendants "could see all the indicia of fraud," had private information into Adams' false personal financial statements, knew of Adams' guaranteed "13% return," saw that money didn't come from or go to mills, and "could have reached only one conclusion: Madison Timber was a fraud," yet "chose instead to enable and sustain" the fraud. That meets Mississippi's definition of "actual knowledge," *see Collier v. Trustmark Nat. Bank*, 678 So. 2d 693, 697 (Miss. 1996), and states a claim for an agreement to accomplish an unlawful purpose. *See also Janvey v. Proskauer Rose LLP*, No. 3:13-CV-477-N, 2015 WL 11121540, at *5

---

[7] "Bad faith" is not an element of civil conspiracy that the receiver is required to assert under Mississippi law. The term "actual knowledge" is also not used in these cases. While the Mississippi Court of Appeals has written that "the alleged confederates must be aware of the fraud or wrongful conduct at the beginning of the agreement," *Bradley v. Kelley Bros. Contractors*, 117 So. 3d 331, 339 (Miss. Ct. App. 2013) (citing a treatise), and the Fifth Circuit relied on that line in *Midwest Feeders, Inc. v. Bank of Franklin*, 886 F.3d 507, 519 (5th Cir. 2018), none of the earlier or later Mississippi Supreme Court cases have adopted that verbiage, *see Rex Distrib.*, 271 So. 3d at 455 and *Gallagher Bassett Servs., Inc. v. Jeffcoat*, 887 So. 2d 777, 786 (Miss. 2004) (collecting cases).

(N.D. Tex. June 23, 2015) (finding that allegation of defendant's knowledge of "unrealistic rates of return," among other things, stated a plausible claim that defendant had knowledge of a fraudulent enterprise).

The banks then argue that the receiver insufficiently alleged an agreement and an overt act. Mississippi law, however, says that the agreement can be "tacit." *Gallagher Bassett Servs., Inc. v. Jeffcoat*, 887 So. 2d 777, 786 (Miss. 2004). The Mississippi Supreme Court also says that the overt act need not be *the bank's* for the bank to be liable. While the plaintiff "has to show an unlawful overt act and it has to show damages," it held recently, "the overt act need not be by [the defendant]. *Rex Distrib.*, 271 So. 3d at 455 (citation omitted). Civil conspiracy "exists as a cause of action to hold nonacting parties responsible," the court explained. *Id.*

Whether the banks will succeed at summary judgment, as the defendant did in their preferred case, *Midwest Feeders, Inc. v. Bank of Franklin*, 886 F.3d 507, 519 (5th Cir. 2018), is reserved for future proceedings.

### C.     Aiding and Abetting

Next, the defendants argue that the aiding and abetting breach of fiduciary duty claim does not exist in Mississippi.

The receiver's claim for aiding and abetting liability is based on § 876(b) of the *Restatement (Second) of Torts*. The section provides, in relevant part, that "one is subject to liability if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." The theory here is that the banks and bankers knew that Lamar Adams' conduct constituted a breach of his fiduciary duties toward Madison Timber, but nevertheless provided him with substantial assistance.

The state courts of Mississippi have not expressed an opinion on whether § 876(b) provides a viable cause of action in this state. It falls to this Court to make an *Erie*-guess into how Mississippi courts would rule. As the Fifth Circuit put it, "in the absence of on-point Mississippi law, our primary obligation is to make an *Erie* guess as to how the Mississippi Supreme Court would decide the question before us." *Keen v. Miller Envtl. Grp., Inc.*, 702 F.3d 239, 243 (5th Cir. 2012).

The standard for making an *Erie*-guess is familiar.

> We base our forecast on (1) decisions of the Mississippi Supreme Court in analogous cases, (2) the rationales and analyses underlying Mississippi Supreme Court decisions on related issues, (3) dicta by the Mississippi Supreme Court, (4) lower state court decisions, (5) the general rule on the question, (6) the rulings of courts of other states to which Mississippi courts look when formulating substantive law and (7) other available sources, such as treatises and legal commentaries. *Absent evidence to the contrary, we presume that the Mississippi courts would adopt the prevailing rule if called upon to do so.*

*Centennial Ins. Co. v. Ryder Truck Rental, Inc.*, 149 F.3d 378, 382 (5th Cir. 1998) (quotation marks, citations, and brackets omitted) (emphasis added).

Applying this standard, two colleagues on this Court have concluded that the Mississippi Supreme Court would recognize a § 876(b) claim for aiding and abetting fraud. *See Dale v. Ala Acquisitions, Inc.*, 203 F. Supp. 2d 694 (S.D. Miss. 2002); *Jones v. KPMG LLP*, No. 1:17-CV-319-LG-RHW, 2018 WL 5018469, at *2 (S.D. Miss. Oct. 16, 2018). The *Dale* court's analysis showed that "the majority of jurisdictions that have addressed the validity of a claim for aiding and abetting under § 876(b) have held that such a claim exists." 203 F. Supp. 2d at 700.

The defendants argue that this was error. They point to this statement from the Fifth Circuit: "When sitting in diversity, a federal court exceeds the bounds of its legitimacy in fashioning novel causes of action not yet recognized by the state courts." *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 781 (5th Cir. 2018).

12

The *DePuy* court rejected a § 876(b) aiding and abetting claim under Texas law, at least in the particular product liability circumstances that case presented.

Strictly as a textual matter, the defendants' preferred sentence does not apply. Jurisdiction in this case is predicated upon a federal question, rather than diversity. More to the point, though, to the extent aiding and abetting breach of duty in the product liability context is too "novel," too close to "inventing a new framework" of state-law liability (and thus prohibited), the claim in our case is not. *Id.* Aiding and abetting "has been recognized in the breach of fiduciary context" in Texas, among other places. *In re Houston Reg'l Sports Network, L.P.*, 547 B.R. 717, 758 (Bankr. S.D. Tex. 2016).

That said, the undersigned also believes that controlling authority instructs that this Court must make an *Erie*-guess, in accordance with the standard recited above, when squarely presented with a question of state law over which it cannot decline supplemental jurisdiction. *E.g.*, *Keen*, 702 F.3d at 243; *Centennial Ins.*, 149 F.3d at 382; *Midwest Feeders*, 886 F.3d at 515-16; *Stacy v. Aetna Cas. & Sur. Co.*, 484 F.2d 289, 292 (5th Cir. 1973) (predicting that "the Mississippi courts would now adopt the rule of 324A"); *Howe ex rel. Howe v. Scottsdale Ins. Co.*, 204 F.3d 624, 627 (5th Cir. 2000) ("If the Louisiana Supreme Court has not ruled on this issue, then this Court **must** make an "Erie guess" and "determine as best it can" what the Louisiana Supreme Court would decide.") (emphasis added).

Here, because there is no evidence that Mississippi would not adopt the prevailing rule, *see Centennial Ins.*, 149 F.3d at 382, this Court concurs with its colleague that an aiding and abetting breach of fiduciary duty claim under § 876(b) would likely be adopted by the Mississippi Supreme Court. *See Dale*, 203 F. Supp. 2d at 701. The motion to dismiss this claim is denied.

### D. Negligence, Gross Negligence, and Recklessness

Next, the defendants contend that the receiver has failed to state a claim for negligence, gross negligence, or recklessness.

Negligence is the failure to use ordinary care. *See George B. Gilmore Co. v. Garrett*, 582 So. 2d 387, 391 (Miss. 1991). A bank has a duty to exercise ordinary care in dealing with its customers. *See, e.g.*, Miss. Code Ann. § 75-4-103(a); *Union Planters Bank, Nat. Ass'n v. Rogers*, 912 So. 2d 116, 123 (Miss. 2005). In addition, a "bank may owe such a duty to a non-customer where a fiduciary relationship exists between the customer and the noncustomer, the bank knows or ought to know of the fiduciary relationship, and the bank has actual knowledge of its customer's misappropriation." *Midwest Feeders*, 886 F.3d at 519 (quotation marks and citation omitted). "To succeed on a claim for negligence, the plaintiff must prove duty, breach, causation and injury." *Rein v. Benchmark Const. Co.*, 865 So. 2d 1134, 1143 (Miss. 2004).

"[T]here is no precise definition of gross negligence, but one of the approximate definitions may be thus expressed: gross negligence is that course of conduct which, under the particular circumstances, disclosed a reckless indifference to consequences without the exertion of any substantial effort to avoid them." *Turner v. City of Ruleville*, 735 So. 2d 226, 229 (Miss. 1999) (citation omitted).

"Recklessness" has been defined as "that degree of fault which lies between intent to do wrong, and the mere reasonable risk of harm involved in ordinary negligence." *Maldonado v. Kelly*, 768 So. 2d 906, 910 (Miss. 2000) (citation omitted). The Mississippi Supreme Court added that recklessness is conduct "so far from a proper state of mind that it is treated in many respects as if harm was intended." *Id.* (citation and emphasis omitted).

The defendants claim that none of the elements of negligence, gross negligence, or recklessness are sufficiently alleged. The undersigned disagrees. Banks have a duty to use ordinary care. The Mississippi Legislature has defined further "ordinary care" for entities dealing with negotiable instruments to mean "observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged." Miss. Code Ann. § 75-3-103(a)(9).

The complaint is rife with allegations of the defendants failing to use ordinary care as to their customers and non-customers. They allegedly had knowledge of a prominent customer operating a Ponzi scheme through their banks, knew that the customer had fiduciary duties to non-customers, and took active steps to encourage and perpetuate the scheme. The allegations set forth a textbook example of defendants who display "a reckless indifference to consequences without the exertion of any substantial effort to avoid them." *Turner*, 735 So. 2d at 229. The present arguments are, therefore, denied.

### E.   Negligent Retention and Supervision

A "claim of negligent hiring, retention and supervision . . . is simply a negligence claim, requiring a finding of duty, breach of duty, causation and damage." *Roman Catholic Diocese of Jackson v. Morrison*, 905 So. 2d 1213, 1229 (Miss. 2005). "In Mississippi, an employer will be liable for negligent hiring or retention of his employee when an employee injures a third party if the employer knew or should have known of the employee's incompetence or unfitness." *Parmenter v. J & B Enterprises, Inc.*, 99 So. 3d 207, 217 (Miss. Ct. App. 2012) (quotation marks and citation omitted). This claim too was permitted to proceed during the Stanford litigation. *See Janvey*, 2015 WL 11121540, at *8.

The banks' arguments against negligent retention and supervision largely echo their arguments against the general negligence claims. The above analysis need not be repeated here. Because the receiver has named specific employees at Trustmark and RiverHills who allegedly actively sustained and provided "material assistance" to the Madison Timber Ponzi scheme, she may proceed with her negligent retention and supervision claims against those banks. *Id.* Her claim against Southern Bancorp, on the other hand, must be dismissed for lack of specific allegations as to an identifiable employee.

F. **Fraudulent Transfer**

The receiver's fraudulent transfer cause of action alleges that all fees and other payments Madison Timber made to the banks for banking services were presumptively fraudulent because they furthered a Ponzi scheme. The defendants object to the cause of action.

For his part, Butts argues that he cannot be held liable for receiving any fraudulent transfers because he never personally received any of the service fees Madison Timber paid to Trustmark. The argument is persuasive. Butts may have indirectly profited from the scheme via his employment compensation, but there is no allegation that he directly received the servicing fees. The fraudulent transfer claim against him is dismissed.

The banks then contend that they too should be dismissed because the receiver is not a "creditor." In this circuit, however, a receiver may invoke state fraudulent transfer laws to "sue a third party that received a fraudulent transfer from the debtor and recover its losses by voiding that transaction." *Janvey v. Dillon Gage, Inc. of Dallas*, 856 F.3d 377, 385 (5th Cir. 2017).

> The knowledge and effects of the fraud of the principal of a Ponzi scheme in making fraudulent conveyances of the funds of the corporations under his evil coercion are not imputed to his captive corporations. Because this knowledge is not imputed to the [Madison Timber] entities, the corporations in receivership, through the receiver, may recover assets or funds that the principal fraudulently diverted to third parties without receiving reasonably equivalent value.

16

*Janvey v. Brown*, 767 F.3d 430, 437 (5th Cir. 2014) (quotation marks and citations omitted).

The banks then claim, amazingly, that the claim fails because Madison Timber received reasonably equivalent value for their fees. This is a way of saying that Madison Timber got its money's worth—after all, the banks got Madison Timber's wires out to investors twice a month, perpetuating the fraud like clockwork—wash, rinse, repeat.

In general, whether a "transfer was made for less than a reasonably equivalent value" is a question of fact. *E.g.*, *Matter of Dunham*, 110 F.3d 286, 289 (5th Cir. 1997). In the Ponzi scheme context, however, the Fifth Circuit has found it "cheek[y]" and arguably "unacceptable" "as a matter of law" for recipients of Ponzi scheme money "to contend that in exchange for the payments he received, the . . . Ponzi scheme benefited from his efforts to extend the fraud by securing new investments." *Warfield v. Byron*, 436 F.3d 551, 560 (5th Cir. 2006) (collecting cases). Prudence suggests that the Court await the evidence before dismissing the receiver's fraudulent transfer claim on the basis of reasonably equivalent value.

      **G.**    **State Racketeering**

The defendants then argue that the receiver has not sufficiently alleged a violation of Mississippi's Racketeer Influenced and Corrupt Organization Act (RICO). The Court agrees.

Under the relevant statute, "[a]ny aggrieved person may institute a civil proceeding under subsection (1) of this section against any person or enterprise *convicted* of engaging in activity in violation of this chapter." Miss. Code Ann. § 97-43-9(5) (emphasis added).

At present, none of today's defendants have been convicted of anything relating to this Ponzi scheme. It follows that the receiver's state RICO claim cannot proceed at this moment.

17

H.    *In Pari Delicto*

Lastly, the defendants contend that the doctrine of *in pari delicto* and Mississippi's "wrongful conduct rule" bar this suit.

"The phrase 'in pari delicto' is Latin for 'in equal fault.' The doctrine of in pari delicto refers to the principle that a plaintiff who has participated in a wrongdoing may not recover damages resulting from the wrongdoing." *Latham v. Johnson*, 262 So. 3d 569, 581 (Miss. Ct. App. 2018) (quotation marks, citation, and brackets omitted). "The doctrine . . . is undergirded by the concerns, first, that courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." *Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 965 (5th Cir. 2012) (citation omitted). "*In pari delicto* is an equitable, affirmative defense, which is controlled by state common law." *Id.* (citations omitted).

The defects with the defendants' argument were well-explained by the *Jones* court. The Fifth Circuit started by reciting that "[a] receiver is the representative and protector of the interests of all persons, including creditors, shareholders and others, in the property of the receivership." *Id.* at 966. It then explained,

> Although a receiver generally has no greater powers than the corporation had as of the date of the receivership, it is well established that when the receiver acts to protect innocent creditors he can maintain and defend actions done in fraud of creditors even though the corporation would not be permitted to do so. The receiver thus acts on behalf of the corporation as a whole, an entity separate from its individual bad actors.

*Id.* (quotation marks, citations, and ellipses omitted). The Jones court declined to apply the *in pari delicto* doctrine.

Under this precedent, the receiver and the receivership estate are legally distinct from Adams and Madison Timber. Where, as here, the receiver is acting on behalf of innocent

18

investor-victims, she "does not stand *in pari delicto* to [her bank], even if" Adams would. *Id.* And, as in *Jones*, "[a]pplication of *in pari delicto* would undermine one of the primary purposes of the receivership established in this case, and would thus be inconsistent with the purposes of the doctrine." *Id.* (citation omitted).

Mississippi's wrongful conduct rule is also unavailing. The rule provides that "no court will lend its aid to a party who grounds his action upon an immoral or illegal act." *Price v. Purdue Pharma Co.*, 920 So. 2d 479, 484 (Miss. 2006) (citation omitted). The Mississippi Supreme Court long ago explained that the judicial system, "from a consideration of its own pecuniary interests, and of the interests of other litigants, may wisely refuse to assist in adjusting equities between persons who have been engaged in an unlawful action." *W. Union Tel. Co. v. McLaurin*, 66 So. 739, 740 (Miss. 1914).

There are no inequities here in permitting the receiver to proceed. Just as with the doctrine of *in pari delicto*, the receivership estate is not limited by the wrongful conduct of Adams and Madison Timber. "The appointment of the receiver removed the wrongdoer from the scene." *Scholes v. Lehmann*, 56 F.3d 750, 754 (7th Cir. 1995). And the equities favor permitting investor-victims to recover from a receiver's suit against those culpable in the Ponzi scheme.

For these reasons, the defendants' equitable arguments for dismissal are denied, without prejudice to their re-urging at the summary judgment stage.

**IV.     Conclusion**

The Court has considered all arguments raised by the parties; those not addressed in this Order would not have changed the result. The motions to dismiss are granted in part and denied in part. The motion for leave to file additional briefing is denied as moot. Within 10 days, all

parties except Watkins shall contact the chambers of the Magistrate Judge to schedule a Case Management Conference.

      **SO ORDERED**, this the 1st day of March, 2021.

                                          s/ Carlton W. Reeves  
                                          UNITED STATES DISTRICT JUDGE